*Prince George's County v. Joseph Watts*, No. 56, September Term, 2025, Opinion by Fader, C.J.

**LOCAL GOVERNMENT TORT CLAIMS ACT – "TORTIOUS ACT OR OMISSION" – STATE STATUTORY CLAIMS**

The Local Government Tort Claims Act ("LGTCA") caps the amount of damages that can be awarded against a local government entity in a lawsuit arising from the "tortious acts or omissions" of local government employees committed within the scope of their employment and without malice. That cap does not apply generally to all State statutory claims. However, the damages cap may apply to State statutory claims that sound in tort if the statutory scheme does not reflect that the General Assembly has made a determination concerning the extent and scope of liability of local governments under that particular statutory scheme.

**MARYLAND FAIR EMPLOYMENT PRACTICES ACT – DISABILITY DISCRIMINATION – RETALIATION – LOCAL GOVERNMENT LIABILITY**

Claims brought for disability discrimination and retaliation under the Maryland Fair Employment Practices Act ("MFEPA") are not subject to the LGTCA damages cap. MFEPA is a comprehensive statutory scheme in which the General Assembly expressly contemplates claims against local governments, provides that those claims be treated the same as claims against other entities, and establishes a separate set of damages caps unique to that statutory scheme. The specific provisions for liability of local governments in MFEPA take precedence over the general provisions in the LGTCA.

**STATE GOVERNMENT § 20-1202 – PRINCE GEORGE'S COUNTY CODE § 2-222 – DISABILITY DISCRIMINATION – LOCAL GOVERNMENT LIABILITY**

Claims brought for disability discrimination under § 20-1202 of the State Government Article for violation of the anti-discrimination provisions of the Prince George's County Code are subject to the LGTCA damages cap. Section 20-1202 does not reflect that the General Assembly contemplated claims against local governments or made any determination concerning the treatment of such claims. Accordingly, the LGTCA general damages cap applies.

IN THE SUPREME COURT

OF MARYLAND

No. 56

September Term, 2025

_____

PRINCE GEORGE'S COUNTY

v.

JOSEPH WATTS

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Getty, Joseph M.,
   (Senior Justice, Specially
   Assigned)

JJ.

_____

Opinion by Fader, C.J.
Watts, J., concurs and dissents.

_____

Filed: July 13, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The Local Government Tort Claims Act, or LGTCA, makes local governments responsible for the "tortious acts or omissions" of their employees committed within the scope of their employment. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 5-301 – 5-304 (2020 Repl.; 2025 Supp.). It also limits the liability of local governments by capping the amount of damages that can be awarded against them and immunizes local government employees from liability for such claims if they acted without malice. *Id.* In this case, we examine whether the LGTCA damages cap applies to claims brought under two state statutes: (1) the Maryland Fair Employment Practices Act, or MFEPA, Md. Code Ann., State Gov't §§ 20-601 – 20-611 (2021 Repl.; 2025 Supp.); and (2) § 20-1202 of the State Government Article, which establishes a state cause of action for violating anti-discrimination provisions in the county codes of Howard, Montgomery, and Prince George's Counties.

The respondent, Joseph Watts, sued the petitioner, Prince George's County (the "County"), alleging employment discrimination based on disability and retaliation. He alleged that the County had unlawfully discriminated against him under both MFEPA and § 2-222 of the Prince George's County Code, and that it had unlawfully retaliated against him under MFEPA. A jury found the County liable for both disability discrimination and retaliation, and awarded Mr. Watts $1,700,000 in damages, including $1,098,104.50 for disability discrimination and $601,895.50 for retaliation. The trial court applied the LGTCA damages cap and entered judgment for a total of $400,000, plus costs and attorney's fees.

The Appellate Court reversed, concluding that the LGTCA liability cap did not apply to Mr. Watts's claims because Mr. Watts's injuries arose from statutory violations, not "tortious acts or omissions."

We agree with the Appellate Court that MFEPA claims are not subject to the LGTCA damages cap. MFEPA is a comprehensive statutory scheme, and it expressly contemplates claims against local governments and requires that they be treated the same as claims against other defendants. Accordingly, such claims are subject to the specific limitations on damages in MFEPA, not the separate, general limitation in the LGTCA. However, we disagree with the Appellate Court concerning Mr. Watts's claim arising under § 20-1202 of the State Government Article, which is not a comprehensive statutory scheme and does not reflect any specific legislative intent with respect to claims against local governments. That claim is therefore subject to the LGTCA damages cap. Consequently, we will affirm in part and reverse in part the Appellate Court's judgment. On remand, the circuit court should enter judgment in favor of Mr. Watts based on the higher of: (1) Mr. Watts's MFEPA claims, after application of the MFEPA damages cap; or (2) his § 20-1202 claim, after application of the LGTCA damages cap.

## BACKGROUND

### A. Legal Framework

We begin with an overview of the statutes and ordinances most relevant to this case.

### 1. *The Local Government Tort Claims Act*

The LGTCA governs the liability of covered local government entities and their employees for "tortious acts or omissions[.]" *See* Cts. & Jud. Proc. §§ 5-301 – 5-304. Specifically, the LGTCA makes a local government responsible "for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." *Id.* § 5-303(b)(1). In turn, the employee is protected from the execution of a judgment based on such conduct unless the employee acted with actual malice. *Id.* § 5-302(b). The local government's liability generally "may not exceed $400,000 per an individual claim, and $800,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions[.]"[1] *Id.* § 5-303(a)(1).

The LGTCA was "passed in response to a perceived insurance crisis plaguing counties, municipalities and their employees." *Espina v. Jackson*, 442 Md. 311, 328 (2015) (quoting *Ennis v. Crenca*, 322 Md. 285, 291 (1991)); *see* S. Jud. Proc. Comm., Testimony of Maureen Lamb, Vice President of the Maryland Ass'n of Counties & Anne Arundel County Council Member, S.B. 237, 397th Gen. Assemb., Reg. Sess., at 1 (Feb. 25, 1987) (explaining that local governments were struggling to purchase liability insurance because

---

[1] The LGTCA provides a higher damages cap for certain claims, including: (1) for "intentional tortious acts or omissions or a violation of a constitutional right committed by a law enforcement officer," Cts. & Jud. Proc. § 5-303(a)(3); and (2) for "claims of sexual abuse, as defined in § 5-117 of [the Courts and Judicial Proceedings Article], that occurred when the claimant was a minor" and that were filed before June 1, 2025, *id.* § 5-303(a)(4).

3

insurance companies were "raising prices" and "abandoning the business of insuring governments[]"). A task force created to address the problem proposed what became the LGTCA. Lt. Gov. J. Joseph Curran, Jr., Task Force on Liab. Ins., *Report of the Governor's Task Force to Study Liability Insurance*, at 13 (Dec. 1985). The task force expressed concern about the costs of lawsuits for local governments without insurance, finding it "obvious" that local governments "must have some form of liability coverage in an era when suits involving civil rights" and other issues were commonplace. *Id.* at 18. A survey cited by the Governor's Legislative Office in a briefing paper to the General Assembly identified a 500% increase in lawsuits filed against municipalities between 1980 and 1985, with the lawsuits filed during that span seeking a combined $106 million in damages. *Espina*, 442 Md. at 329.

Soon after, the General Assembly enacted the LGTCA for "the purpose of[,]" among other things, "establishing a limit on the liability of the local governments of the State[.]" 1987 Md. Laws, Ch. 594; *see also Bd. of County Comm'rs of St. Mary's County v. Marcas, L.L.C.*, 415 Md. 676, 686 (2010) (stating that "[i]t is clear that the limitation on liability provision [of the LGTCA] was enacted 'for the purpose of limiting the civil liability of local government'" (quoting S. Jud. Proc. Comm., Summary of Comm. Rep., S.B. 237, 397th Gen. Assemb., Reg. Sess., at 3 (1987))). The Governor's Legislative Office explained that the limitation on liability "is necessary so that local governments can predict exposure for both insurance and budgetary purposes." *Marcas*, 415 Md. at 686

4

(quoting Governor's Legis. Off. Briefing Paper, H.B. 253/S.B. 237, 397th Gen. Assemb., Reg. Sess., at 9-10 (1987)).

Limiting the liability of local governments was not the sole purpose of the LGTCA, however, as it also sought "'to provide a remedy for persons who are injured by local government employees, who often have limited resources from which an injured person might collect on a judgment,' and to 'ensure that the financial burden of compensation is carried by the local government that is ultimately responsible for its employees' acts.'" *Baltimore City Police Dep't v. Potts*¸ 468 Md. 265, 318-19 (2020) (citation modified) (first quoting *Beall v. Hollaway-Johnson*, 446 Md. 48, 76 (2016); and then quoting *Litz v. Maryland Dep't of Env't*, 446 Md. 254, 279 (2016)). The LGTCA thus prohibits local governments from asserting "governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established" under the LGTCA. Cts. & Jud. Proc. § 5-303(b)(2).

### 2. The Maryland Fair Employment Practices Act

MFEPA prohibits employment discrimination based on several characteristics including, as relevant to Mr. Watts's claim, disability. State Gov't § 20-606(a). The Act also prohibits retaliation against individuals pursuing relief under its provisions. *Id.* § 20-606(f) ("An employer may not discriminate or retaliate against any of its employees . . . because the individual has: (1) opposed any practice prohibited by this subtitle; or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the subtitle.").

Under MFEPA, an employee who alleges that an employer engaged in an unlawful employment practice may bring a private cause of action against the employer. *Id.* § 20-1013(a). The Act defines "unlawful employment practice" to include any act prohibited by § 20-606 of the State Government Article, *id.* § 20-1001, which includes (1) discriminating against any individual with respect to their employment because of, as relevant to Mr. Watts's claim, "disability unrelated in nature and extent so as to reasonably preclude the performance of the employment[,]" *id.* § 20-606(a)(1)(i), and (2) "fail[ing] or refus[ing] to make a reasonable accommodation for the known disability of an otherwise qualified employee or an applicant for employment[,]" *id.* § 20-606(a)(4). If a "court finds that an unlawful employment practice occurred," it "may provide the remedies specified in § 20-1009(b)" of the State Government Article, *id.* § 20-1013(d), which "may include":

(i) enjoining the respondent from engaging in the discriminatory act;

(ii) ordering appropriate affirmative relief, including the reinstatement or hiring of employees, with or without back pay;

(iii) awarding compensatory damages; or

(iv) ordering any other equitable relief that the . . . judge considers appropriate.

*Id.* § 20-1009(b)(1). The statute specifies that compensatory damages awards "are in addition to" back pay and interest on back pay, as well as any equitable relief awarded. *Id.* § 20-1009(b)(2).

MFEPA caps "the amount of compensatory damages" that may be awarded "for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of

6

enjoyment of life, or nonpecuniary losses," based on the size of the employer. *Id.* § 20-1009(b)(3). The highest limit, applicable to employers who, like the County,[2] employ "not fewer than 501 employees," is $300,000. *Id.* § 20-1009(b)(3)(iv). That limit does not apply to back pay.[3] *Id.* § 20-1009(b)(2)(i).

Subtitle 9 of MFEPA specifically addresses claims against governmental entities, stating that, with exceptions not relevant here, "a unit, officer, or employee of the State, a county, or a municipal corporation may not engage in a discriminatory act prohibited by[,]" among other provisions, § 20-606 of the State Government Article. *Id.* § 20-901(a). An employment discrimination claim brought against any such entity or person is subject to the same "rules, procedures, powers, rights, and remedies . . . as those that apply in a discrimination case in which a private person is the respondent."[4] *Id.* § 20-902(a).

---

[2] The County employed 7,691 people in Fiscal Year 2025. Prince George's County Off. of Fin., *Annual Comprehensive Financial Report (ACFR) FY2025*, at 208 (Feb. 7, 2026), https://www.princegeorgescountymd.gov/sites/default/files/media-document/2025 Annual Comprehensive Financial Report.pdf (last accessed June 29, 2026).

[3] The statute has other provisions applicable to back pay awards. For example, if back pay is awarded, "the award shall be reduced by any interim earnings or amounts earnable with reasonable diligence by the person discriminated against." State Gov't § 20-1009(b)(4). And "a complainant may [also] recover back pay for up to 2 years preceding the filing of the complaint, where the unlawful employment practice that has occurred during the complaint filing period is similar or related to an unlawful employment practice with regard to discrimination in compensation that occurred outside the time for filing a complaint." *Id.* § 20-1009(b)(5).

[4] Section 20-903 of the State Government Article prohibits the State from raising the defense of sovereign immunity in an employment case filed under MFEPA. Section 20-904 provides that if the State lacks sufficient money to pay an award made under MFEPA, the affected governmental unit or officer must report the award to the Comptroller, who must then report the amount of all outstanding awards annually to the

### 3. Prince George's County Code § 2-222 and State Government § 20-1202

Prince George's County Code § 2-222 (Supp. 2025) provides: "No employer in the County shall discharge or refuse to hire any person, or act against any person with respect to compensation or other terms and conditions of employment, or limit, segregate, classify, or assign employees because of discrimination." For purposes of § 2-222, as relevant to Mr. Watts's claim, "[d]iscrimination" means "acting, or failing to act, or unduly delaying any action regarding any person because of . . . disability . . . in such a way that such person is adversely affected in the area[] of . . . employment . . . ." Prince George's County, Md., Code § 2-186(a)(6). And the term "[e]mployer includes the Prince George's County Government." *Id.* § 2-186(a)(8).

The Prince George's County Code establishes a Human Rights Commission to investigate discrimination allegations and initiate complaints. *Id.* §§ 2-187(a), 2-192, 2-193. Upon a finding of discrimination, the Commission may issue a cease-and-desist order that, in addition to injunctive relief, may require an award of back pay and reimbursement of expenses caused by the discriminatory conduct.[5] *Id.* § 2-195; *see* Md.

---

Governor, who is required to "include in the State budget sufficient money to pay all awards made against the State under" MFEPA. *Id.* § 20-904(b), (c).

[5] In an employment discrimination case, the Commission may also award damages to compensate for humiliation and embarrassment, subject to a $200,000 limit, Prince George's County, Md., Code § 2-195.01(a)(3); impose a fine of up to $10,000, *id.* § 2-195.01(b); issue a civil fine of $5,000 per violation, *id.* § 2-195.01(c)(1); file a lien for unpaid wages, *id.* § 2-195.01(c)(2); and recommend disqualification or debarment, *id.* § 2-195.01(c)(3).

8

Code Ann., Local Gov't § 10-202(d) (2013 Repl.) (allowing counties to fine violators of local employment discrimination laws); Code of Maryland Regulations 09.12.39.02 (explaining how to file liens for unpaid wages).

In addition to administrative enforcement, the Prince George's County Code also purports to authorize a private right of action in § 2-200, which provides, in relevant part: "Any person who is aggrieved by any act prohibited in this Division may bring an appropriate action in law or equity in the Circuit Court to seek damages, redress of injury, or injunctive relief arising out of any such prohibited act[.]"

In *McCrory Corp. v. Fowler*, this Court struck down as unconstitutional a Montgomery County Code provision that, like § 2-200, purported to authorize a private cause of action for violation of a county anti-discrimination provision. 319 Md. 12, 24 (1990), *superseded by statute*, 1992 Md. Laws, Ch. 555. At the time, Montgomery County Code § 27-20(a) purported to "create[] a private cause of action to remedy violations of a county anti-employment discrimination ordinance." *McCrory*, 319 Md. at 14. We considered whether § 27-20(a) exceeded the authority delegated to the County by Article XI-A of the Constitution of Maryland, also known as the Home Rule Amendment, and the Express Powers Act, which implements Article XI-A. *Id.* at 16-24; *see generally Engage Armament LLC v. Montgomery County*, 494 Md. 1, 32-33 (2026) (explaining the contours of the Home Rule Amendment and the Express Powers Act's grant of legislative authority to charter counties).

9

We observed that the power provided to counties under § 3 of Article XI-A is the power "to enact local laws[.]" *McCrory*, 319 Md. at 17 (emphasis omitted) (quoting Md. Const. art. XI-A, § 3). We further observed that the creation of a new judicial cause of action "has traditionally been done either by the General Assembly or by this Court under its authority to modify the common law of this State." *McCrory*, 319 Md. at 20. Ultimately, we held "that an ordinance attempting to combat employment discrimination by creating a new private judicial cause of action is not a 'local law' under Article XI-A of the Maryland Constitution, and thus is not within the power of Montgomery County to enact." *Id.* at 24; *see also Sweeney v. Hartz Mountain Corp.*, 319 Md. 440, 444 (1990) (invalidating a similar Howard County ordinance).

In response to our decision in *McCrory*, the General Assembly enacted Chapter 555 of the 1992 Laws of Maryland, originally codified in former Article 49B, § 42 of the Maryland Code. Chapter 555 created a new civil cause of action for persons who were "subjected to an act of discrimination prohibited by the Montgomery County Code . . . for damages, injunctive relief, or other civil relief." 1992 Md. Laws, Ch. 555. The following year, the General Assembly extended the new cause of action to persons subjected to acts of discrimination prohibited by the county codes of Prince George's and Howard Counties. 1993 Md. Laws, Ch. 152. In 2009, that provision was moved to § 20-1202 of the State Government Article. At the time Mr. Watts filed his complaint, § 20-1202 provided:

(a) Scope of section.

This section applies only in Howard County, Montgomery County, and Prince George's County.

(b) Civil action authorized.

In accordance with this section, a person that is subjected to a discriminatory act prohibited by the county code may bring and maintain a civil action against the person that committed the alleged discriminatory act for damages, injunctive relief, or other civil relief.

(c) Time for filing; venue.

(1) An action under subsection (b) of this section shall be commenced in the circuit court for the county in which the alleged discriminatory act occurred within 2 years after the occurrence of the alleged discriminatory act.

(2) (i) Subject to paragraph (1) of this subsection, an action under subsection (b) of this section alleging discrimination in employment or public accommodations may not be commenced sooner than 45 days after the aggrieved person files a complaint with the county unit responsible for handling violations of the county discrimination laws.

(ii) Subject to paragraph (1) of this subsection, an action under subsection (b) of this section alleging discrimination in real estate may be commenced at any time.

(d) Fees and costs.

In a civil action under this section, the court may award the prevailing party reasonable attorney's fees, expert witness fees, and costs.

State Gov't § 20-1202 (2021 Repl.).

In *Edwards Systems Technology v. Corbin*, this Court rejected a challenge to the constitutionality of § 20-1202 that was premised on a violation of § 2-222 of the Prince George's County Code. 379 Md. 278, 300 (2004). We determined that § 20-1202 is not

11

an unconstitutional local law[6] both because it applies to three counties and because "it creates a new cause of action in the circuit courts," which the General Assembly, unlike a county, is competent to do. *Id.* at 296. We further observed that § 2-222 itself was within the authority of Prince George's County to enact because

> a chartered county generally has the authority to prohibit discrimination occurring in the county, to define the elements of a claim by one injured by such discrimination, to provide for an adjudicatory administrative proceeding by which the injured party may obtain relief, and to provide for a traditional judicial review action in the circuit court for a party aggrieved by the final administrative decision.

*Id.* at 298. And the creation of a new state cause of action for violation of prohibitions in county codes was within the authority of the General Assembly because "it is ordinarily not a constitutionally impermissible delegation of legislative authority for a legislative body to adopt a standard promulgated by a different governmental entity." *Id.* at 299. The establishment of a cause of action in § 20-1202 of the State Government Article for violation of, among other provisions, § 2-222 of the Prince George's County Code thus

---

[6] Charter counties may enact only local laws; a law enacted by a charter county that is not a local law is unconstitutional. *Assanah-Carroll v. Law Offs. of Edward J. Maher, P.C.*, 480 Md. 394, 424-25 (2022) ("[I]f an 'ordinance enacted by a charter county does not constitute a 'local law' within the meaning of Article XI-A, it is beyond the authority of a charter county and, therefore, is unconstitutional." (quoting *Montgomery County v. Broadcast Equities, Inc.*, 360 Md. 438, 441 n.1 (2000))). With respect to charter counties, the General Assembly may *not* enact local laws; a local law enacted by the General Assembly for a charter county is unconstitutional. *Baltimore City Bd. of Elections v. Mayor & City Council of Baltimore*, 489 Md. 465, 479 (2025) ("[U]nder Md. Const., Art. XI-A, § 3, in a local jurisdiction governed by charter, only the local legislature may enact local laws[.]"); *see generally Engage Armament*, 494 Md. at 32-33, 65-68.

rectified the problem that had been identified in *McCrory* and was constitutional. *Id.* at 296, 300.

In sum, § 20-1202 of the State Government Article establishes a valid cause of action for committing a discriminatory act that is prohibited by § 2-222 of the Prince George's County Code.

## B.       Factual & Procedural Background

Mr. Watts was a correctional officer for the Prince George's County Department of Corrections who underwent amputation of his left foot after an infection. In this lawsuit, Mr. Watts alleged that the Department discriminated against him in connection with his efforts to return to work. The Department eventually fired him for failing to comply with requirements that he asserted were discriminatory.

Mr. Watts sued the County in the Circuit Court for Prince George's County, contending that the Department illegally terminated his employment due to his disabilities and that the Department did so in retaliation for him raising discrimination concerns and requesting reasonable accommodations. He brought two counts of disability discrimination, one under MFEPA and the other under § 2-222 of the Prince George's County Code, and a third count for retaliation under MFEPA. After a trial, the jury found in favor of Mr. Watts and awarded $1,700,000 in damages. The verdict sheet combined the MFEPA and County Code discrimination claims, asking whether the jury found "by a preponderance of the evidence that [the County] committed disability discrimination." The jury found that the County did discriminate and awarded $255,681 for back pay, $240,528

13

for future monetary losses, and $601,895.50 for "Other Damages" on that claim. The jury also found that the County "committed retaliation" and awarded $601,895.50 in "Other Damages," but awarded no back pay or future monetary losses.

The County filed a post-trial motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial and remittitur. Regarding remittitur, the County argued that the jury's verdict should be capped under both MFEPA and the LGTCA. The County first argued that MFEPA caps the jury's award for all damages other than back pay at $300,000. *See* State Gov't § 20-1009(b)(3)(iv). The County also argued that the back pay award should be reduced to $197,720, for a total award of $497,720.

In the alternative, the County contended that the LGTCA cap of $400,000 per occurrence applies to all the unliquidated damages awarded by the jury, including future monetary losses and other damages, which, after adding the reduced back pay, would have resulted in a total award of $597,720.

Mr. Watts responded that the MFEPA caps were "irrelevant" because neither State Government § 20-1202 nor the Prince George's County Code places any limit on the damages that may be recovered. In the event the court disagreed, he argued that any cap would apply only to the "Other Damages" awards and not to back pay or future monetary losses, and that it would apply separately to the awards for discrimination and retaliation. He also argued that the jury's back pay award was correct.

Mr. Watts further argued that the LGTCA damages cap did not apply because MFEPA specifies that a plaintiff's remedies are the same regardless of whether the

14

employer is a local government or a private entity. *See* State Gov't § 20-902(a). He also argued that the LGTCA is inapplicable because statutory disability discrimination and retaliation claims are not "tortious acts or omissions" for purposes of the LGTCA. In the alternative, Mr. Watts contended that the LGTCA cap would apply only to unliquidated damages, not the jury's awards for back pay or future monetary loss, and that it should apply separately to the discrimination and retaliation awards.

The trial court, relying on this Court's opinions in *Town of Riverdale Park v. Ashkar*, 474 Md. 581 (2021), *Espina v. Jackson*, 442 Md. 311 (2015), and *Board of County Commissioners of St. Mary's County v. Marcas, L.L.C.*, 415 Md. 676 (2010), ruled that the LGTCA damages cap applied to the entire award and reduced the jury's verdict to $400,000. The trial court also awarded Mr. Watts costs and attorney's fees, and it denied the County's other motions.

The Appellate Court reversed, holding that the LGTCA limitation on liability for "tortious acts and omissions" did not apply to Mr. Watts's claims. *Watts v. Prince George's County*, 267 Md. App. 332, 335 (2025). The court concluded, based on its interpretation of this Court's reasoning in *Espina* and *Williams v. Morgan State University*, 484 Md. 534 (2023), that the LGTCA does not encompass statutory discrimination and retaliation claims. *Watts*, 267 Md. App. at 348-53.

We granted certiorari to determine whether disability discrimination and retaliation claims brought under MFEPA and claims premised on a violation of the anti-discrimination

15

in employment provision of the Prince George's County Code are subject to the damages cap in the LGTCA. *Prince George's County v. Watts*, 493 Md. 168 (2026).

## DISCUSSION

The issue before us is one of statutory construction: whether the LGTCA cap on damages that can be awarded against a local government for the "tortious acts or omissions" of its employees applies to Mr. Watts's statutory disability discrimination and retaliation claims. We review statutory interpretation issues without deference. *Bowens v. State Farm Mut. Auto. Ins. Co.*, 492 Md. 608, 615-16 (2025).

"The goal of statutory construction is to discern and carry out the intent of the Legislature." *Engage Armament*, 494 Md. at 35 (quoting *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024)). "We begin with the text, which we view wholistically and in its full context, employing available tools for textual analysis." *In re Bowman*, ___ Md. ___, ___, Misc. No. 26, Sep. Term 2025, 2026 WL 1791569, at *9 (June 23, 2026). "Presuming the General Assembly intends its enactments to operate together as a consistent and harmonious body of law, we also seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Engage Armament*, 494 Md. at 35 (quoting *Westminster Mgmt.*, 486 Md. at 644-45). If a statute is ambiguous either inherently or in context, we search for legislative intent in other indicia, including "the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it." *Id.* at 36 (quoting *Westminster Mgmt.*, 486 Md. at 645). "[I]n every case, the statute must be given

16

a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Id.* (quoting *Westminster Mgmt.*, 486 Md. at 646). Furthermore, when interpreting multiple statutes in tandem, we aim to "harmonize" their provisions so that each statute "may be given effect." *Engage Armament*, 494 Md. at 40 (quoting *Doe v. Montgomery County Bd. of Elections*, 406 Md. 697, 713 (2008)).

## I. TORTIOUS ACTS OR OMISSIONS UNDER THE LGTCA

The County contends that acts of discrimination and retaliation in violation of MFEPA and State Government § 20-1202 are civil wrongs that constitute "tortious acts or omissions" under the LGTCA, and so are subject to the LGTCA cap on damages. Mr. Watts, relying largely on our recent opinion in *Williams*, argues that the LGTCA does not apply to any statutory claims. The County responds that *Williams* did not resolve the issue in dispute here.

Given the centrality of our decision in *Williams*, which interpreted the Maryland Tort Claims Act ("MTCA") rather than the LGTCA, we will begin there. Before doing so, however, we pause to make an observation about the general utility of relying on cases interpreting the MTCA to help interpret the LGTCA, and the other way around. Although the MTCA pertains to the State and the LGTCA to local governments, the statutory schemes share a number of similar features, including ensuring recovery for successful plaintiffs by substituting government liability for the liability of individual personnel, protecting personnel whose tortious acts are merely negligent from liability, limiting the potential liability of government entities, and requiring timely notice of claims. Given the

17

many similarities between those two statutory schemes, we have often found it useful to compare them. *See, e.g.*, *State v. Young*, ___ Md. ___, ___, No. 27, Sep. Term, 2025, 2026 WL 1801178, at *6-7 (June 23, 2026) (relying in part on our adoption of the "cause" test to identify the number of occurrences under the LGTCA in adopting the same test for the same purpose under the MTCA); *Rios v. Montgomery County*, 386 Md. 104, 131-32 (2005) (applying our decision about the constitutionality of the MTCA's 180-day claim requirement to the LGTCA's 180-day notice requirement "because of the similarity of terminology and purpose in the two statutes"). Here, as well, it is natural to look to a case interpreting the MTCA, which uses "tort action" and "tortious acts or omissions" interchangeably in describing the acts of personnel for which the State may be responsible, State Gov't § 12-104(a)(1) (waiving the State's immunity for certain "tort action[s]"); *id.* § 12-104(a)(2)(ii) (providing that the State's immunity is not waived for intentional "tortious acts or omissions"), in interpreting the LGTCA's use of "tortious acts or omissions" to describe the acts of personnel for which local governments may be responsible, *see* Cts. & Jud. Proc. § 5-302.

However, there are important differences between the two statutory schemes that may result in divergent interpretations of even similar terms in some instances. As we recently explained, the two laws "emerge[d] from different starting points." *Young*, ___ Md. at ___, 2026 WL 1801178 at *7 n.7. Although the State enjoyed complete sovereign immunity from tort claims at common law, local governments enjoyed a narrower governmental immunity. *Id.* The MTCA partially waived the State's sovereign immunity

18

to allow plaintiffs to recover something from the State where they previously could not recover anything. *Id.* The LGTCA, by contrast, was enacted at least in part in response to concerns about the need to limit the existing liability of local governments, as they were becoming difficult to insure. *Id.* Applying the MTCA to a particular statutory claim thus effectuates a partial waiver of sovereign immunity, and such waivers are construed narrowly in favor of the State. *See Bd. of Educ. for Wicomico County v. Sturm*, ___ Md. ___, ___, No. 54, Sep. Term, 2025, 2026 WL 1800743, at *9 (June 23, 2026). By contrast, determining that the LGTCA applies to a particular statutory claim does not necessarily invoke the same consideration. And while the State's tradeoff of its own liability for immunity for its personnel is a key feature of the MTCA, *Williams*, 484 Md. at 551-52, local governments were already subject to liability for many of the claims covered by the LGTCA.

### A. *Williams v. Morgan State University*

In *Williams*, we held that federal statutory claims are not "tort action[s]" for which the State has partially waived its sovereign immunity under the MTCA. 484 Md. at 554. Mr. Watts contends that our reasoning in *Williams* establishes that state statutory claims cannot be "tortious acts or omissions" under the LGTCA. We disagree.

The plaintiff in *Williams* alleged that she was wrongfully terminated in violation of two federal statutes. *Id.* at 539. She asserted that her federal statutory claims were "tort actions" and, therefore, fell within the scope of the State's partial waiver of sovereign immunity under the MTCA. *Id.* at 545. The State argued that its sovereign immunity

19

barred the suit because the MTCA did not waive immunity for federal statutory claims. *Id.* at 545-46.

The plaintiff claimed that this Court had already broadened the scope of "tort action[]" to reach "beyond common law tort actions" in such a way that the term would encompass federal statutory claims. *Id.* at 548-50. That argument was based on three opinions of this Court, none of which involved federal statutory claims. We rejected that argument after analyzing those cases. We first discussed that in *Green v. N.B.S., Inc.*, 409 Md. 528 (2009), we had held "not that the plaintiff's [Maryland Consumer Protection Act] claim was a 'tort action,' but that it was 'a personal injury action' to which [Courts and Judicial Proceedings] § 11-108 applied." *Williams*, 484 Md. at 549 (quoting *Green*, 409 Md. at 541). We acknowledged that "*Black's Law Dictionary* defined 'tort' in part as a 'civil wrong for which a remedy may be obtained,' but did not limit it to 'wrongs that were recognized as a civil wrong at common law.'" *Id.* (quoting *Green*, 409 Md. at 542). However, we observed that that broad definition "was not dispositive" with respect to the Consumer Protection Act claims at issue in *Green*. *Williams*, 484 Md. at 550. We next discussed that in the relevant passage in *Espina*, 442 Md. at 325, we primarily reiterated our earlier decision in *Green* in concluding that the LGTCA applied to constitutional torts as well as common law torts. *Williams*, 484 Md. at 549.

Finally, we discussed that in *Lee v. Cline*, 384 Md. 245 (2004), "we concluded that the MTCA applies to State constitutional torts[,]" without mentioning statutory claims at all. *Williams*, 484 Md. at 550. We observed that although "our opinion in *Lee* stands for

20

the proposition that 'tort action' in the MTCA is not limited only to common law torts, it provides no support for [the] contention that the phrase extends to statutory claims." *Id.* (internal citations omitted).

Returning to the MTCA itself, we then identified five "textual and contextual reasons" for our ultimate conclusion that "the General Assembly did not intend the phrase 'tort action' to extend to statutory claims generally, and especially not to federal statutory claims." *Id.* Some of those reasons were specific to the MTCA and considerations of State sovereign immunity; others more directly inform our interpretation of the LGTCA here. We discuss each in turn.

First, we observed that "the plain text of the MTCA's waiver provision does not contain any indication that it applies to federal statutory claims." *Id.* Because "we construe waivers of the State's sovereign immunity in favor of retaining that immunity[,]" we stated our expectation that the General Assembly would plainly indicate its intent to waive sovereign immunity as to federal statutory claims. *Id.* at 550-51. That factor has no application here, where we are not construing a waiver of sovereign immunity.

Second, we stated that we have "never held that 'tort action' or any similar phrase, either as used in the MTCA or in any other statute, applies generally to State statutory claims[,]" much less to claims based on federal statutes. *Id.* at 551. If "tort action" generally included state statutory claims, we observed, then we would be forced to conclude that the General Assembly implicitly waived the State's sovereign immunity under the MTCA as to "all other state statutes that contain a private right of action and

21

sound in tort." *Id.* Contrary to Mr. Watts's argument, that observation was not dispositive in *Williams* and is not dispositive here. We have never held that either "tort action" or "tortious act or omission" applies generally to all state statutory claims, but we also have never held that they do not, much less that they may not apply specifically to a subset of state statutory claims.

Third, we observed that the limited waiver of sovereign immunity in the MTCA for a "tort action" had to be construed in the context of the MTCA's statutory scheme, including the tradeoff in which the State substituted its own liability for that of its employees. *Id.* at 551-52. Under the MTCA, that tradeoff applies directly in common law and constitutional tort suits, as to which, pre-MTCA, the State had immunity and its personnel did not. *Id.* But, we noted, that tradeoff does not apply to either State or federal statutory schemes, for different reasons. In crafting State statutory schemes, unlike with common law or constitutional torts, "the General Assembly has the ability to place liability where it chooses." *Id.* at 552. Accordingly, "[i]t would be unnecessary to resort to a separate statutory scheme, like the MTCA, to allocate liability for State statutory claims." *Id.* In federal statutory schemes, by contrast, the General Assembly has "no ability to insulate the State's personnel from individual liability" at all. *Id.* Here, the General Assembly's ability to allocate liability in enacting specific state statutory schemes— including the ability to choose whether individual employees have liability at all—also weighs against a determination that the LGTCA applies generally to all such schemes.

22

Fourth, we observed that "when the General Assembly has intended to waive the State's sovereign immunity for purposes of a State statutory claim, it generally has done so directly within the specific statutory scheme at issue[,]" and the MTCA "does not apply" in such cases. *Id.* at 553. That made us "especially reticent to conclude" that the General Assembly intended the MTCA to serve as a broad waiver of sovereign immunity for "statutory claims generally, much less federal statutory claims." *Id.* at 553-54. Here, the General Assembly's ability to determine the extent of a local government's liability in connection with any specific statutory scheme also weighs against concluding that the LGTCA applies generally to state statutory schemes, at least when the General Assembly has utilized that ability.

And fifth, we observed that "the General Assembly has demonstrated that it knows how to waive sovereign immunity to federal claims when that is its intent." *Id.* at 554. As an example, we noted that in § 5-518 of the Courts and Judicial Proceedings Article, the General Assembly had partially waived the sovereign immunity of county boards of education for "all claims." *Id.*; *see also Bd. of Educ. of Baltimore County v. Zimmer-Rubert*, 409 Md. 200, 203 (2009) (holding that the waiver in § 5-518 for "all claims" extended to suits under the federal Age Discrimination in Employment Act). Here as well, as we will see in discussing MFEPA, *see below* at 31-35, the General Assembly has demonstrated that it knows how to address the scope of liability of local governments under specific statutory schemes, making us reticent to conclude that the LGTCA applies generally to all state statutory schemes.

Our holding in *Williams* was expressly limited to federal statutory causes of action. *Williams*, 484 Md. at 554. We reserved any decision concerning "whether the MTCA waives sovereign immunity generally for state statutory claims that sound in tort[,]" although we observed that if it did, "such a waiver would necessarily be limited to state statutory claims that are not covered by another waiver of sovereign immunity specific to the scheme."[7] *Id.* at 554-55.

In sum, our decision in *Williams* did not turn on the character of the statutory claims at issue and their relationship with the common understanding of a "tort action." To the contrary, our decision relied on other factors, including that: (1) we would not apply a broad definition of "tort action" to accomplish an implicit waiver of sovereign immunity that would be inconsistent with the broader statutory scheme; (2) we would not interpret the waiver to apply generally to statutory schemes over which the General Assembly did not have any control in allocating liability; and (3) where the State did have that control, we would not interpret the waiver to reach claims where the State had exercised it.

---

[7] We noted in *Williams* that one past decision suggests that the MTCA applies to at least some state statutory claims. 484 Md. at 554 n.10; *see Lopez v. Maryland State Highway Admin.*, 327 Md. 486, 489 (1992) ("When the legislature passed the MTCA and abrogated the State's sovereign immunity, it imposed certain procedural requirements that must be met in order to maintain a common law or statutory tort claim against the State."). But, we observed, we have never "held that the MTCA abrogated the State's sovereign immunity with respect to *all* state statutory tort claims." *Williams*, 484 Md. at 554 n.10.

24

**B. The LGTCA Does Not Apply Generally to All State Statutory Claims but It May Apply to Specific State Statutory Claims.**

We disagree with Mr. Watts that *Williams*, which addressed a different statutory scheme—the MTCA—and a different set of statutory claims—federal statutory claims—is dispositive here. Nonetheless, we agree with him that the LGTCA does not apply generally to all state statutory schemes.

Beginning our analysis with the plain language, we make two preliminary observations. First, although the LGTCA does not expressly reference state statutory schemes, it describes the conduct of local government personnel to which it might apply using the broad phrase "tortious acts or omissions." Second, here, unlike in *Williams*, the LGTCA does not waive sovereign immunity and, accordingly, is not strictly construed.

We have previously recognized that tortious conduct is not limited to common law torts. In *Lee* and *Espina*, we determined that the MTCA and LGTCA each respectively applied to constitutional torts in addition to common law torts. *Lee*, 384 Md. at 261; *Espina*, 442 Md. at 317. And in *Green*, although our holding was that an action under the Consumer Protection Act constituted a "personal injury action" for purposes of § 11-108 of the Courts and Judicial Proceedings Article, we "conclud[ed] that 'tortious conduct' encompassed a broad range of tortious actions." *Espina*, 442 Md. at 324-25 (discussing *Green*). In both *Espina* and *Green*, we referenced the broad definitions in Black's Law Dictionary of "tortious" as "[c]onstituting a tort; wrongful"; and "tort" as "[a] civil wrong for which a remedy may be obtained, usually in the form of damages; a breach of a duty that the law imposes on everyone in the same relation to one another as those involved in

25

a given transaction." *Espina*, 442 Md. at 325 (quoting *Green*, 409 Md. at 542); *Green*, 409 Md. at 542 (quoting *Green v. N.B.S., Inc.*, 180 Md. App. 639, 646-47 (2008) (in turn quoting Black's Law Dictionary 1497 (7th ed. 1999))); *see also* Md. L. Encyclopedia Torts § 1 (same).[8]

We have little difficulty in concluding that at least some statutory claims constitute civil wrongs for which remedies, including damages, are available when a party breaches a general duty established in law; in other words, tortious acts or omissions. A claim of employment discrimination in violation of a statute that expressly prohibits such discrimination is just such a claim. Indeed, a statutory employment discrimination claim is not only akin to the common law tort claim of wrongful discharge but has displaced that cause of action where the statute applies. *See Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 609-20 (1989) (discussing the interplay between a tort claim for wrongful discharge and a statutory employment discrimination claim); *see also Adler v. Am. Standard Corp.*, 291 Md. 31, 42-43 (1981) (recognizing the common law tort of wrongful discharge as an exception to the at-will employment doctrine).

However, unlike common law and constitutional torts, and also unlike federal statutory claims, the General Assembly has the ability to determine the "imposition and

---

[8] The current version of Black's Law Dictionary continues to define "tortious" as "[c]onstituting a tort; wrongful[.]" *Tortious*, Black's Law Dictionary 1800 (12th ed. 2024). The definition of "tort" is slightly modified, but to the same effect, to include "[a] civil wrong, other than breach of contract, for which a remedy may be obtained, usu[ally] in the form of damages; a breach of a duty that the law imposes on persons who stand in a particular relation to one another[.]" *Tort*, Black's Law Dictionary 1798 (12th ed. 2024).

26

scope of liability" in crafting state statutory claims. *Williams*, 484 Md. at 552. Not only does it have the ability to do so, but at least some state statutory schemes containing private rights of action are comprehensive schemes in which the General Assembly has struck a purposeful balance concerning the scope of liability among affected parties, including governmental entities. Accordingly, "[i]t would be unnecessary to resort to a separate statutory scheme, like the [LGTCA], to allocate liability for State statutory claims[,]" at least where the General Assembly has done so. *See id.* Moreover, in such cases, a specific statute that addresses the liability of local government entities within the statutory scheme should ordinarily take precedence over a general statute, like the LGTCA, that contains a different allocation. *See, e.g.*, *Engage Armament*, 494 Md. at 40 ("[A] more specific statute will ordinarily prevail over a more general one.").

Our analysis in *Proctor v. Washington Metropolitan Area Transit Authority*, 412 Md. 691 (2010), is instructive. There, the question was whether the MTCA affected "the broad waiver of sovereign immunity" in the compact that created the Washington Metropolitan Area Transit Authority. *Id.* at 699-700. We observed that the MTCA states that it does not "limit any other law that . . . waives the sovereign immunity of the State or the units of the State government in tort[.]" *Id.* at 711-12 (emphasis omitted) (quoting State Gov't § 12-103(1)(i)). We interpreted that provision as establishing that the MTCA was a "gap-filler" intended to waive a State agency's immunity only "when no other statute expressly waived the agency's immunity." *Id.* at 712. We therefore concluded that "when the Legislature has chosen to waive the sovereign immunity of a State agency . . . by

27

statute, the terms of the statute specific to the agency . . . apply to the waiver, not the terms of the MTCA." *Id.* at 722. Accordingly, we determined that the limit on the State's waiver of sovereign immunity under the MTCA did not apply to claims against the Transit Authority. *Id.* at 724.

The County argues that the LGTCA should be interpreted in light of its primary purpose of limiting the liability of local governments. Recognizing that purpose, the County contends, weighs in favor of interpreting the LGTCA to apply generally to all state statutory claims. There are two primary problems with that argument. First, as we have discussed, although the General Assembly developed a mechanism to limit the liability of local governments generally for tortious acts and omissions in the LGTCA, it has reached a different policy judgment with respect to the liability of local governments under other statutory schemes. We discuss the specific choices the General Assembly made with respect to local governments in MFEPA below at 31-35. We would not honor the General Assembly's intent by ignoring those specific choices and applying the general LGTCA cap instead. Second, even though the LGTCA was enacted in response to concern about escalating liabilities of local governments, *Marcas*, 415 Md. at 686, limiting the liability of local governments is not its only purpose. The LGTCA is also designed to ensure recovery for plaintiffs by making local governments responsible for paying judgments against local government personnel, and it protects such personnel by preventing plaintiffs from pursuing judgments against them in the absence of malice. *See Baltimore City Police Dep't v. Potts¸* 468 Md. 265, 318-19 (2020).

We hold that the LGTCA's limitation on damages does not apply generally to all state statutory claims. The LGTCA is a general statute containing a general mechanism to limit the otherwise uncapped liability of local governments for tortious acts or omissions. Where the General Assembly has provided for a different balance in enacting statutory schemes that authorize private causes of action against local governments, the LGTCA does not apply. That may be the case where a more specific statutory scheme expressly provides for the treatment of claims against local governments or where the other scheme is sufficiently comprehensive that we can infer that the General Assembly contemplated such claims. However, where state statutory claims sound in tort and it is not apparent that the General Assembly has made a decision concerning how to treat claims against local governments, the LGTCA may apply.

The County argues that if the General Assembly did not intend state statutory claims to be subject to the LGTCA, it would have included a specific exemption for such claims, just as it has specifically authorized higher damages caps for intentional torts committed by law enforcement officers and, for a period of time, claims involving child sexual abuse. *See* Cts. & Jud. Proc. § 5-303(a)(3), (4). We disagree. In interpreting the LGTCA to not apply generally to all state statutory claims, but recognizing that it might apply to certain specific statutory claims, we are harmonizing the LGTCA with other statutory schemes.

While the County contends that the LGTCA applies to all state statutory claims, Mr. Watts argues that it does not apply to any state statutory claims, a result he contends is dictated by *Williams*. We have already explained why that argument is incorrect.

29

Mr. Watts also argues that applying the LGTCA to statutory employment discrimination claims would not serve the purposes of the LGTCA because that statute is intended to substitute the liability of a local government entity for the liability of its personnel. Because local government personnel cannot be held liable for employment discrimination, he argues, the purposes of the LGTCA are not served by applying its caps to such claims. However, as we have previously explained, a primary purpose of the LGTCA was to "limit[] the civil liability of local government." *Marcas*, 415 Md. at 686 (quoting S. Jud. Proc. Comm., Summary of Comm. Rep., S.B. 237, 397th Gen. Assemb., Reg. Sess., at 3 (1987)).

Moreover, as the General Assembly made clear in overruling this Court's decision in *Housing Authority of Baltimore City v. Bennett*, 359 Md. 356 (2000), the Legislature's intent is for the LGTCA to cap liability for both direct claims made against local governments and claims made against their personnel. "In *Bennett*, this Court held that the LGTCA damage cap did not apply to any tort actions where the local government itself is a defendant." *Espina*, 442 Md. at 330 (emphasis omitted). The General Assembly responded with an emergency measure "clarifying that the monetary limits on the liability of a local government under the [LGTCA] apply to claims against local governments when named as defendants[.]" 2001 Md. Laws, Ch. 286. Accordingly, contrary to Mr. Watts's argument, it is entirely consistent with the intent underlying the LGTCA to apply its damages cap to state statutory claims against local governments that are otherwise

30

uncapped where the statutory scheme does not evidence a decision by the General Assembly that such claims should be uncapped.

In sum, we conclude that the LGTCA does not apply generally to all state statutory claims, but that it may apply to state statutory claims sounding in tort and arising under a specific state statutory scheme if that scheme does not evidence a legislative intent to treat claims against local governments in a different manner.

## II. MR. WATTS'S CLAIMS

Having determined that the LGTCA may apply to specific state statutory claims, we turn to the two state statutory schemes under which Mr. Watts prevailed: (1) his claims for discrimination and retaliation under MFEPA; and (2) his claim under State Government § 20-1202 for a violation of § 2-222 of the Prince George's County Code.

### A. The Maryland Fair Employment Practices Act

MFEPA is a comprehensive statute banning employment discrimination in Maryland. It includes a statement of policy, declaring that it is the policy of the State of Maryland, in the exercise of its police power:

> (1) to assure all persons equal opportunity in receiving employment and in all labor management-union relations, regardless of race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, military status, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; and

> (2) to that end, to prohibit discrimination in employment by any person.

State Gov't § 20-602.

31

MFEPA provides multiple clarifications, carveouts, and exemptions that define the scope of its coverage and mandate. It does not: (1) require an employer "to grant preferential treatment" to a certain individual or group to rectify an imbalance relative to the general population, *id.* § 20-603(1); (2) require a religious or disability accommodation that would impose an "undue hardship on the conduct of the employer's business[,]" *id.* § 20-603(2); (3) apply to the employment of "aliens outside of the State," *id.* § 20-604(1); (4) apply to religious institutions "with respect to the employment of individuals of a particular religion, sexual orientation, gender identity, or military status to perform work connected with the activities of the religious entity[,]" *id.* § 20-604(2); (5) prohibit hiring based on certain otherwise prohibited characteristics if they constitute "a bona fide occupational qualification[,]" *id.* § 20-605(a)(1); (6) prohibit an employer from establishing "reasonable workplace appearance, grooming, and dress standards," subject to certain caveats, *id.* § 20-605(a)(2); (7) prohibit a religious educational institution from hiring individuals of a particular religion, *id.* § 20-605(a)(3); or (8) prohibit observance of a "bona fide seniority system" or "bona fide employee benefit plan," *id.* § 20-605(a)(4).

Subject to those clarifications, carveouts, and exemptions, MFEPA, in § 20-606, identifies multiple types of employment practices as unlawful if engaged in by employers, employment agencies, and labor organizations on the basis of an "individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, military status, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment[.]" *Id.* § 20-606(a)-(d). The Act also

prohibits retaliation against individuals pursuing relief under the statute. *Id.* § 20-606(f). And MFEPA contains specific provisions concerning when an unlawful employment practice relating to compensation occurs, *id.* § 20-607; the treatment of disabilities caused by pregnancy, *id.* § 20-609; unlawful practices related to unpaid internships, *id.* § 20-610; and unlawful harassment, *id.* § 20-611.

MFEPA also contains comprehensive enforcement provisions, including provisions: (1) authorizing the filing of a complaint with the Commission on Civil Rights and establishing time limits and rules for such complaints, *id.* § 20-1004; (2) providing for investigation by the Commission and conciliation, *id.* § 20-1005; (3) allowing for the initiation of a civil action by the Commission upon a finding of probable cause, *id.* § 20-1007; (4) providing, in the alternative, for an administrative hearing on the charges, with available remedies including injunctive relief, reinstatement, back pay, compensatory damages, and other equitable relief, *id.* §§ 20-1008, 20-1009; (5) limiting the compensatory damages that may be awarded based on the size of the employer, ranging from $50,000 for employers with between 15 and 100 employees to $300,000 for employers with more than 500 employees, *id.* § 20-1009(b)(3); (6) addressing the powers of the Commission and enforcement of its orders, *id.* §§ 20-1010, 20-1011; and (7) authorizing a private right of action for a complainant to file a civil action against a respondent, provided the complainant first files an administrative charge, waits at least 180 days, and files the action within two years of the unlawful practice, *id.* § 20-1013. Such a direct civil action must be filed in the circuit court for the county in which the unlawful employment practice

33

occurred, can seek any of the remedies available in an administrative proceeding as well as punitive damages, and can be tried to a jury. *Id.* § 20-1013(b), (d), (e), (f).

Notably, MFEPA also expressly addresses its application to governmental entities and officials. Section 20-901(a) of the State Government Article provides that "a unit, officer, or employee of the State, a county, or a municipal corporation may not engage in a discriminatory act prohibited by[,]" among other provisions, § 20-606. Section 20-902(a) then provides that in an employment discrimination action against a governmental entity or official, "the rules, procedures, powers, rights, and remedies that apply are the same as those that apply in a discrimination case in which a private person is the respondent."[9]

In sum, MFEPA is a comprehensive statutory scheme that reflects detailed consideration of the scope of its coverage and its application to various categories and types of possible respondents. It also contains provisions concerning the types of damages that are available for violations and its own cap on compensatory damages based on the employer's size. *Id.* § 20-1009(b)(3). And it expressly applies to county governments and, in that circumstance, mandates the same remedies as are available against a private employer. *Id.* §§ 20-901(a), 20-902(a). Accordingly, MFEPA stands on its own and we have no hesitation in concluding that the LGTCA cap on damages does not apply to MFEPA claims.

---

[9] Sections 20-903 and 20-904 waive the State's sovereign immunity for such claims and provide for payment of awards.

**B.      Section 20-1202 Claims**

Although contained in the same Title of the State Government Article as MFEPA, Subtitle 12 of Title 20 operates completely independently from the rest of the title.  Even the definitions contained in § 20-101 apply only to "Subtitles 1 through 11 of this title[.]" *Id.* § 20-101(a).  Subtitle 12 contains three sections.[10]  Section 20-1201 provides that the term "prevailing party" "has the meaning as judicially determined under 42 U.S.C. § 1988." Section 20-1203 applies only to Baltimore County.  And § 20-1202, consisting of four short subsections, is the provision at issue here.

Subsection 20-1202(a) provides that the section applies only to Howard, Montgomery, and Prince George's Counties.  *Id.* § 20-1202(a).  Subsection (b) then effectively incorporates the substantive requirements of § 2-222 of the Prince George's County Code by creating a cause of action for "a person that is subjected to a discriminatory act prohibited by the county code[.]"  *Id.* § 20-1202(b).  By reference, then, § 20-1202 provides a cause of action to an individual whose covered employer violates the prohibition in the Prince George's County Code against "discharg[ing] . . . any person . . . because of discrimination[,]" Prince George's County, Md., Code § 2-222, which includes "acting . . . regarding any person because of . . . disability . . . in such a way that such person is adversely affected in the area[] of . . . employment[.]"  *Id.* § 2-186(a)(6).

---

[10] Effective October 1, 2026, Subtitle 12 will add a fourth section.  *See* 2026 Md. Laws, Ch. 172.  Forthcoming State Government § 20-1204 is not relevant to the issues in this appeal.

Notably, however, § 20-1202 does not incorporate any provisions of the Prince George's County Code establishing the contours of the cause of action. Instead, in subsections (b), (c), and (d), § 20-1202 provides a limited set of its own contours, including establishing: (1) the permitted remedies, which are "damages, injunctive relief, or other civil relief[,]" *id.* § 20-1202(b); (2) the court in which such a claim may be brought, *id.* § 20-1202(c)(1); (3) the prerequisites for bringing a claim, including that it be commenced within two years of the alleged discriminatory act and at least 45 days after the complainant "files a complaint with the county unit responsible for handling violations of the county discrimination laws[,]" *id.* § 20-1202(c)(2)(i); and (4) the prevailing party's eligibility for an award of reasonable attorney's fees, expert witness fees, and costs, *id.* § 20-1202(d).

Although this Court has not previously had the opportunity to analyze damages available for claims brought under § 20-1202, the Appellate Court has. In *Edgewood Management Corp. v. Jackson*, a plaintiff brought a claim under § 20-1202 for an alleged violation of § 27-19(c) of the Montgomery County Code, alleging that she was functionally fired for reporting a sex discrimination complaint. 212 Md. App. 177, 182 (2013). The issue before the Appellate Court was whether a limitation on damages contained within the Montgomery County Code applied to the plaintiff's claim under § 20-1202. *Id.* at 211. The court concluded that the county code's limit did not apply because § 20-1202 established a private civil action under State law for common law damages that did not adopt the limitation in the county code. *Id.* at 227. The court found "no evidence of any intention to transport" the county code's limitation on damages to claims brought under

36

§ 20-1202. *Id.* Accordingly, the court determined that the plaintiff could recover under "Maryland's common law of damages." *Id.*

Similarly, in *Shabazz v. Bob Evans Farms, Inc.*, the Appellate Court declined to apply federal Title VII jurisprudence about damages in employment discrimination cases to a claim brought under the predecessor to § 20-1202. 163 Md. App. 602, 642 (2005). The court held that "[u]nless the General Assembly has stated otherwise, . . . the meaning of [§ 20-1202], a state enactment, is to be interpreted by application of Maryland common law." *Id.* at 638. It reasoned that "there is nothing" in § 20-1202 "to indicate that the General Assembly intended to incorporate" other laws about damages "in place of the Maryland common law[.]" *Id.* at 642. The General Assembly did not amend § 20-1202 in the wake of the Appellate Court's decisions in *Edgewood Management* or *Shabazz*.

We agree with the persuasive reasoning of the Appellate Court in those cases. Section 20-1202 is an independent State cause of action for the violation of the substantive anti-discrimination provisions in the Howard, Montgomery, and Prince George's County codes. In creating that cause of action, the General Assembly did not incorporate any provisions of the three county codes at issue purporting to define or limit the cause of action. Indeed, it did not even defer to those codes concerning timing limitations, instead establishing its own statute of limitations and waiting period after filing an administrative complaint with the respective county human rights agency.

Section 20-1202 stands in stark contrast to MFEPA with respect to its general comprehensiveness and specific treatment of claims against governmental entities. Section

37

20-1202 establishes a cause of action for common law damages without any differentiation based on the type or category of defendant. It does not even mention local government entities as potential defendants. Simply put, § 20-1202 does not provide any indication that the General Assembly contemplated claims against local governments and decided to impose a different scope of liability than that provided by the LGTCA. Under that circumstance, we hold that the LGTCA cap on damages applies. To decide otherwise would be to subject local governments to exactly what the LGTCA was adopted to prevent—uncapped liability to claims sounding in tort—with no indication that the General Assembly intended that result.

Mr. Watts disagrees. He argues that neither the Prince George's County Code nor § 20-1202 evidence any intent to cap damages under the LGTCA. He points out that neither contains explicit limits on damages and that the Appellate Court determined that common law damages should govern § 20-1202 claims in *Edgewood Management* and *Shabazz*. He also argues that the legislative history of § 20-1202 does not indicate that the LGTCA should apply to it. With respect to the county code, although he is correct that it does not cap damages, that is irrelevant because the cause of action arises under § 20-1202, not the county code. *See Edgewood Mgmt.*, 212 Md. App at 227; *Shabazz*, 163 Md. App. at 642. And with respect to § 20-1202, its barebones provisions and lack of any attention to claims against local governments provide no indication that the General Assembly contemplated such claims and decided that damages should not be capped. That is particularly so given the divergence between § 20-1202 and the caps the General Assembly

38

imposes on the award of compensatory damages for employment discrimination claims under MFEPA.[11]

Mr. Watts also argues that the LGTCA damages cap was enacted for the sake of equity, as the LGTCA exposed local governments to liability in situations where they previously would not have been liable. Here, per Mr. Watts, because § 20-1202 subjected local governments to employment discrimination and liability claims independently of the LGTCA, there is no reason to apply its caps as a matter of equity. However, his position overlooks the General Assembly's purpose in enacting the LGTCA of eliminating uncapped local government liability to enable local governments to "predict exposure for both insurance and budgetary purposes." *Marcas*, 415 Md. at 686 (quoting Governor's Legis. Off., Briefing Paper, H.B. 253/S.B. 237, 397th Gen. Assemb., Reg. Sess., at 9-10 (1987)). Where there is no indication in the statutory scheme of any intent to diverge from the legislative judgment in the LGTCA, the limitation on liability in the LGTCA applies.

In sum, we do not agree fully with the position of either party. We do not agree with the County that the LGTCA liability cap applies to all state statutory claims sounding in tort, nor do we agree with Mr. Watts that the cap does not apply to any such claims.

---

[11] Given the dichotomy between the employer-size-based caps on compensatory damages for employment discrimination claims under MFEPA and the absence of any caps under § 20-1202, the General Assembly may choose to consider whether those divergent provisions accurately reflect its intent. That is particularly the case given that the Howard County Code purports to cap damages awards for employment discrimination claims, *see* Howard County, Md., Code §§ 12.216, 12.217(III), but that cap is not reflected in § 20-1202 itself.

39

With respect to the two state statutory claims at issue, we hold that the LGTCA cap does not apply to Mr. Watts's MFEPA claims but that it does apply to his claim under § 20-1202 of the State Government Article. Accordingly, Mr. Watts will be entitled to a judgment in whichever amount is higher: (a) his MFEPA claims after application of the limitations provision of that statutory scheme; or (b) his § 20-1202 claim after application of the LGTCA damages cap. *See Anne Arundel County v. Reeves*, 474 Md. 46, 67 (2021) (stating that "there can be only one recovery of damages" for a single legal injury). It will be up to the circuit court on remand to make those calculations.

## CONCLUSION

We hold that the LGTCA cap on local government liability for "tortious acts and omissions" does not apply generally to all state statutory claims that sound in tort but that it may apply to specific statutory claims that sound in tort where there is no indication in the statutory scheme that the General Assembly contemplated claims against local governments and decided to impose a different scope of liability. As applied here, the LGTCA cap does not apply to Mr. Watts's MFEPA claims but does apply to his claim under § 20-1202 of the State Government Article.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT AND REMAND TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE SPLIT EQUALLY BY THE PARTIES.**

IN THE SUPREME COURT

OF MARYLAND

No. 56

September Term, 2025

_____

PRINCE GEORGE'S COUNTY,
MARYLAND

v.

JOSEPH WATTS

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Getty, Joseph M. (Senior Justice,
Specially Assigned),

JJ.

_____

Concurring and Dissenting Opinion by Watts, J.

_____

Filed: July 13, 2026

Respectfully, I concur and dissent. I would hold that the damages cap of the Local Government Tort Claims Act ("LGTCA"), Md. Code Ann., Cts. & Jud. Proc. (1974, 2020 Repl. Vol.) ("CJ") § 5-303, does not apply to employment discrimination and retaliation claims brought under either Md. Code Ann., State Gov't (2014, 2021 Repl. Vol.) ("SG") § 20-1013, enforcing the Maryland Fair Employment Practices Act ("MFEPA"), SG § 20-606, or SG § 20-1202, enforcing the anti-discrimination ordinance of the Prince George's County Code ("PGCC"), PGCC § 2-222. As such, I would affirm in its totality the judgment of the Appellate Court of Maryland, which reversed the judgment of the Circuit Court for Prince George's County and remanded the case for further proceedings consistent with its opinion. See Watts v. Prince George's Cnty., 267 Md. App. 332, 334, 345 A.3d 1113, 1114-15 (2025). I concur with the Majority that MFEPA claims are not subject to the damages cap of the LGTCA. See Maj. Slip Op. at 2. I part ways with the Majority, though, in its holding that claims arising under SG § 20-1202 and PGCC § 2-222 are subject to the damages cap of the LGTCA. See Maj. Slip Op. at 2.

The Majority reaches the incongruent conclusion that the damages cap of the LGTCA does not apply to claims brought under MFEPA but nevertheless applies to claims brought under the PGCC's anti-discrimination ordinance. See Maj. Slip Op. at 2. This is an illogical result given that the PGCC ordinance and the statute through which it is enforced, SG § 20-1202, do not impose a cap on damages for employment discrimination and retaliation claims. This is a basic matter of statutory construction.

"[T]he cardinal rule of statutory interpretation is to ascertain and effectuate the actual intent of the legislative body in enacting the law under consideration." Cherry v.

Mayor and City Council of Baltimore City, 475 Md. 565, 597, 257 A.3d 1087, 1105 (2021) (citation modified). "[T]o determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the [legislative body] is presumed to have meant what it said and said what it meant." Adelakun v. Adelakun, 491 Md. 1, 18, 338 A.3d 614, 624 (2025) (citation modified). "If the statutory language is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." Cherry, 475 Md. at 597, 257 A.3d at 1105 (citation modified). "If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." Adelakun, 491 Md. at 18, 338 A.3d at 624 (citation modified).

"We construe local ordinances and charters under the same canons of statutory construction as we apply to statutes[,]" with the plain language of the ordinance serving as "the primary source of legislative intent." Cherry, 475 Md. at 598, 257 A.3d at 1105 (citation modified). "In determining the legislative intent of a local ordinance, we assign the words of the ordinance their ordinary and natural meaning and avoid adding or deleting words to impose a meaning inconsistent with the plain language of the measure." Id. at 598, 257 A.3d at 1105 (citation modified). And, we "must read the language of the charter or ordinance in context and in relation to all of its provisions." Id. at 598, 257 A.3d at 1105 (citation modified).

Here, neither the plain language of SG § 20-1202 nor the provisions of the PGCC

pertaining to prohibited acts in employment, PGCC §§ 2-222 to 2-228.01, include, let alone mention, any sort of cap on damages for employment discrimination and retaliation claims. By its plain language, SG § 20-1202(b) provides that, in Howard, Montgomery, and Prince George's Counties, "a person that is subjected to a discriminatory act prohibited by the county code may bring and maintain a civil action against the person that committed the alleged discriminatory act for damages, injunctive relief, or other civil relief." An action under SG § 20-1202(b) must be brought "in the circuit court for the county in which the alleged discriminatory act occurred within 2 years after the occurrence of the alleged discriminatory act." SG § 20-1202(c)(1). With respect to a claim alleging employment discrimination, an action "may not be commenced sooner than 45 days after the aggrieved person files a complaint with the county unit responsible for handling violations of the county discrimination laws." SG § 20-1202(c)(2)(i). The only reference to any sort of monetary component of such a claim is set forth in SG § 20-1202(d), which provides that, "[i]n a civil action under this section, the court may award the prevailing party reasonable attorney's fees, expert witness fees, and costs." By its plain language, no provision of SG § 20-1202 sets forth a cap on damages for an employment discrimination claim brought in Prince George's County and the statute does not mention or in any way refer to the LGCTA or the damages cap under the LGTCA.

The General Assembly would presumably have been aware that there is no case law which declares that State statutory causes of actions are considered "tortious acts or omissions" under the LGTCA. Given this, it is hard to imagine that the General Assembly intended the LGTCA to cap damages in causes of action alleging discrimination in

- 3 -

employment, public accommodations, and real estate that are authorized under SG § 20-1202. The Majority holds that SG § 20-1202 is an independent State cause of action for the violation of anti-discrimination provisions in the Howard, Montgomery, and Prince George's County codes. See Maj. Slip Op. at 37. The Majority agrees with the Appellate Court's reasoning in Shabazz v. Bob Evans Farms, Inc., 163 Md. App. 602, 642, 881 A.2d 1212. 1235 (2005), that there is nothing to indicate that, in enacting SG § 20-1202, the General Assembly intended to incorporate "other laws about damages" in place of the common law. Maj. Slip Op. at 37. That said, with SG § 20-1202, the General Assembly has enacted a State statute, which gives rise to a wide variety of causes of action for violations of any number of County code provisions. It is difficult to believe that without mentioning it in SG § 20-1202 and without knowing the content of the County code provisions, the General Assembly intended that the LGTCA would cap damages for all actions brought under SG § 20-1202.

In holding that the LGTCA does not apply to MFEPA, the Majority spills much ink explaining "that the LGTCA's limitation on damages does not apply generally to all state statutory claims." Maj. Slip Op. at 29. Yet in holding that, "[w]here there is no indication in the statutory scheme of any intent to diverge from the legislative judgment in the LGTCA, the limitation on liability in the LGTCA applies[,]" the Majority concludes that the LGTCA applies to all State statutory claims unless the General Assembly has said otherwise. Maj. Slip Op. at 39.

SG § 20-1202 applies to a person that is subjected to a discriminatory act prohibited by the County codes and, on its face, SG § 20-1202(c)(2) applies to, at a minimum, actions

- 4 -

alleging discrimination in employment, public accommodations, or real estate. It would be improbable that without any knowledge of the elements of the actions, the General Assembly decided that such actions are all claims for "tortious acts or omission" and that therefore damages are capped by the LGTCA.

In addition to not being indicative of the General Assembly's intent, the Majority's holding conflicts with our case law. Although Williams v. Morgan State Univ., 484 Md. 534, 300 A.3d 54 (2023), does not squarely govern, it is instructive. In Williams, id. at 550, 300 A.3d at 63, we concluded that "the General Assembly did not intend the phrase 'tort action' to extend to statutory claims generally, and especially not to federal statutory claims" for several reasons.[1] Among the reasons, we explained that this Court had never held that the phrase "tort action," as used in the MTCA and other statutes, applied generally to State statutory claims. See id. at 551, 300 A.3d at 63-64. This is an important point. Although there were a myriad of other reasons for our holding in Williams, id. at 538-40,

---

[1]First, we explained that the plain language of the waiver provision of the Maryland Tort Claims Act ("MTCA") did not contain any indication that it applied to federal statutory claims; stated otherwise, there was no express language in the MTCA extending the State's waiver of sovereign immunity to federal statutory claims. See Williams, 484 Md. at 550-51, 300 A.3d at 63. We also concluded that "the General Assembly's waiver of sovereign immunity under the MTCA operates in tandem with the General Assembly's grant of immunity to State Personnel where the State's waiver is triggered[,]" and to adopt an expansive definition of "tort action" "would eliminate the General Assembly's exercise of control in defining the scope of the State's liability." Id. at 551-53, 300 A.3d at 64. We explained that where the General Assembly intends to waive the State's sovereign immunity for a State statutory claim, "it generally has done so directly within the specific statutory scheme at issue." Id. at 553, 300 A.3d at 64-65 (citations omitted). And, where a statute includes a waiver of the State's sovereign immunity, the statutes usually include procedural or administrative requirements that must be satisfied before a claimant can file suit. See id. at 553, 300 A.3d at 65.

544, 300 A.3d at 56-57, 59, that Maryland's waiver of sovereign immunity for "a tort action" under the Maryland Tort Claims Act ("MTCA") does not waive the State's sovereign immunity for the federal statutory claims asserted by the plaintiff,[2] in answering the certified question of law, we recognized that in deciding whether the MTCA applied there must be a determination as to whether the statutory claims were "tort actions." But, in concluding that the LGTCA applies to actions under SG § 20-1202, the Majority subjects claims for discrimination in accommodations and housing to no such analysis. And, with respect to employment discrimination, the Majority summarily concludes:

> We have little difficulty in concluding that at least some statutory claims constitute civil wrongs for which remedies, including damages, are available when a party breaches a general duty established in law; in other words, tortious acts or omissions. A claim of employment discrimination in violation of a statute that expressly prohibits such discrimination is just such a claim. Indeed, a statutory employment discrimination claim is not only akin to the common law tort claim of wrongful discharge but has displaced that cause of action where the statute applies. *See Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 609-20 (1989) (discussing the interplay between a tort claim for wrongful discharge and a statutory employment discrimination claim); *see also Adler v. Am. Standard Corp.*, 291 Md. 31, 42-43 (1981) (recognizing the common law tort of wrongful discharge as an exception to the at-will employment doctrine).

Maj. Slip Op. at 26.

I disagree with the Majority's conclusion in at least two key respects. First, the Majority's analysis overlooks that if the General Assembly intended to limit liability of local governments for employment discrimination claims under the LGTCA, it could have

---

[2]The plaintiff's claims asserted retaliation in violation of the National Defense Authorization Act and the American Recovery Reinvestment Act. See Williams, 484 Md. at 539, 300 A.3d at 57.

- 6 -

done so in MFEPA, rather than enact a separate damage cap statutory scheme. Second, the Majority's analysis fails to take into account the requirements of a discrimination action under the PGCC, or the Howard or Montgomery County Codes.

Nothing in PGCC § 2-222, the ordinance under which Respondent brought a claim, includes a damages cap or refers to or mentions the damages cap of the LGTCA. PGCC § 2-222 provides: "No employer in the County shall discharge or refuse to hire any person, or act against any person with respect to compensation or other terms and conditions of employment, or limit, segregate, classify, or assign employees because of discrimination."[3] PGCC § 2-186(a)(6) provides:

> Discrimination shall mean acting, or failing to act, or unduly delaying any action regarding any person because of race, religion, color, sex, national origin, age (except as required by State or Federal law), occupation, familial status, marital status, political opinion, personal appearance, sexual orientation, disability, or gender identity, in such a way that such person is adversely affected in the areas of housing and residential real estate, employment, law enforcement, education, public accommodations, or commercial real estate.

(Bolding omitted). This is not language indicative of a claim that involves proof of a "tortious act or omission" requiring establishment of a general duty in law for which the

---

[3]The other ordinances of the PGCC pertaining to prohibited acts in employment, PGCC §§ 2-223 to 2-228.01, also do not include a damages cap or refer to some other damages cap contained in a separate statute. For example, PGCC § 2-223 provides: "No employment agency in the County shall fail or refuse to refer a person for employment or act against any person respecting the kind of employment for which a referral could have been made, or classify a person for employment because of discrimination." As another example, PGCC § 2-226 provides: "No person shall print or publish, or cause to be printed or published, any notice or advertisement relating to employment which indicates a preference, limitation, or specification based upon discrimination, except where such requirement or prerequisite is a bona fide occupational qualification as set forth in this Subdivision."

breach of and causation of injury may result in the recovery of damages.

PGCC §§ 2-186(a)(6) and 2-222 establish an action akin to a strict liability action for discrimination in employment. Although strict liability actions may be considered tort actions, not all require proof of the existence of a "general duty [] in law[.]" Maj. Slip Op. at 26; see, e.g., Quinn v. Gen. Elec. Co., 493 Md. 589, 603, 356 A.3d 2, 11 (2026) ("[A] strict liability design defect claim does not require proof of a duty." (Citations omitted)). Although the concept of a societal duty may underly the basis for strict liability claims, such claims do not require proof of a "tortious act or omission." I cannot agree that "[a] claim of employment discrimination in violation of a statute that expressly prohibits such discrimination" must be considered a claim involving a "tortious act or omission" under the LGTCA. Maj. Slip Op. at 26. Reaching such a conclusion about statutory employment discrimination claims brought under SG § 20-2012 without any analysis of the County code provisions at issue establishes the type of blanket rule that the Majority said should not apply. Maj. Slip Op. at 25.

It is clear that neither the General Assembly nor the counties affected by SG § 20-2012 view the LGTCA as applicable to the statute. The Prince George's County Council could have included a damages cap when it enacted PGCC § 2-222 or referenced the LGCTA, but it chose not to do so. Nothing in the language of SG § 20-2012 prevented it from doing so. In Howard County, the Howard County Council enacted a damages cap that applies to its unlawful employment practices ordinance. Like PGCC § 2-222, Howard County Code ("HCC") § 12-208.II(a) provides that it is unlawful because of discrimination for an employer to discharge a person, refuse to hire a person, act against a person with

respect to compensation or other terms and conditions of employment, or limit, segregate, classify, or assign employees. HCC § 12-217.III expressly provides a limit on damages for unlawful employment practices, stating:

> The sum of the amount of compensatory damages awarded to each complainant aggrieved by an unlawful employment practice prohibited by section 12.208 of this Subtitle for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, or nonpecuniary losses, may not exceed:
>
> (a) Fifty thousand dollars, if the respondent employs not fewer than five and not more than 100 employees in each of 20 or more calendar weeks in the current or preceding calendar year;
>
> (b) One hundred thousand dollars, if the respondent employs not fewer than 101 and not more than 200 employees in each of 20 or more calendar weeks in the current or preceding calendar year;
>
> (c) Two hundred thousand dollars, if the respondent employs not fewer than 201 and not more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year; and
>
> (d) Three hundred thousand dollars, if the respondent employs not fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year.[4]

Concluding that the damages cap of the LGTCA applies to employment and retaliation claims brought under the PGCC is inconsistent with Howard County imposing its own damages cap on such claims. If the damages cap of the LGTCA applies to employment and retaliation claims brought under the PGCC, it would necessarily have to apply to such claims brought under the HCC, given that SG § 20-1202 applies to both counties.

---

[4]HCC § 12-217.III's damage cap provisions are almost identical to those the General Assembly set forth in MFEPA. The Howard County Council's decision to impose a damages cap that mirror those of MFEPA, not the LGCTA, confirms that it did not think that the LGCTA applied.

If the General Assembly had intended for the counties covered by SG § 20-1202 to be bound by the damages cap of the LGTCA or some other damages cap, it certainly could have amended SG § 20-1202 after Howard County enacted HCC § 12-217.III. The General Assembly would presumably have been aware of the question concerning whether statutory causes of actions may be considered "tortious acts or omissions" under the LGTCA. And, if it had intended as much, then in the face of Howard County having imposed its own damages cap, while the other two counties did not, the General Assembly could have amended SG § 20-1202 to make clear that it meant for all three counties to be subject to the same damages cap. But, the General Assembly has not done so.

The fact of the matter is that SG § 20-1202 does not mention, refer to, or incorporate a cap on damages. The General Assembly has restricted only the type of relief that may be sought (damages, injunctive relief, or other civil relief), not the amount of damages. See SG § 20-1202(b). The legislative history of SG § 20-1202 supports this conclusion.

In 2009, when Md. Code, Art. 49B, §§ 42 and 40(a) were recodified as SG § 20-1202 when the new title of Human Relations was added to the State Government Article of the Annotated Code of Maryland, see 2009 Md. Laws 540-41, 653 (Vol. I, Ch. 120, H.B. 51), the Fiscal and Policy Note for House Bill 51 described subtitle 12 as follows: "Authorizes a person subjected to a discriminatory act prohibited by the county code in Baltimore County, Howard County, Montgomery County, or Prince George's County to bring a civil action in the circuit court for the applicable county, and specifies the relief available in an action under this subtitle[,]" Fiscal and Policy Note, at 3, H.B. 51, 2009 Gen. Assemb., Reg. Sess. (Md. 2009), https://mgaleg.maryland.gov/2009rs/fnotes/

bil_0001/hb0051.pdf [https://perma.cc/P4A6-FFVN]. The General Assembly did not indicate that anything in subtitle 12 or the LGTCA specifies or otherwise limits the amount of relief available. The absence of any language in SG § 20-1202, and the Bill recodifying its predecessor, referring to a cap on damages or to anything that would indicate a restriction on the amount of damages that may be sought where a person brings a civil action for damages, injunctive relief, or other civil relief supports the conclusion that the General Assembly did not intend to impose such a limitation. As such, each of the three counties may enact an ordinance with such a cap, as Howard County has done. Prince George's County has no such limitation. I would therefore hold that damages cap of the LGTCA does not apply to claims brought under either MFEPA or PGCC § 2-222.

> To recap, with respect to MFEPA, the Majority concludes:

> MFEPA is a comprehensive statutory scheme that reflects detailed consideration of the scope of its coverage and its application to various categories and types of possible respondents. It also contains provisions concerning the types of damages that are available for violations and its own cap on compensatory damages based on the employer's size. [SG] § 20-1009(b)(3). And it expressly applies to county governments and, in that circumstance, mandates the same remedies as are available against a private employer. *Id.* §§ 20-901(a), 20-902(a). Accordingly, MFEPA stands on its own and we have no hesitation in concluding that the LGTCA cap on damages does not apply to MFEPA claims.

Maj. Slip Op. at 34. Yet, as to SG § 20-1202, the Majority holds that the LGTCA's damages cap applies because the statute "does not provide any indication that the General Assembly contemplated claims against local governments and decided to impose a different scope of liability than that provided by the LGTCA." Maj. Slip Op. at 38.

The Majority's reasoning appears to be:

1. The LGTCA, unlike the MTCA, was enacted to limit a local government's liability for tortious acts or omissions.  <u>See</u> Maj. Slip Op. at 28.

2. "A claim of employment discrimination in violation of a statute that expressly prohibits such discrimination" is a claim for a civil wrong that is a tortious act or omission.  Maj. Slip Op. at 26.

3. Because SG § 20-1202 does not provide a cap or scope of liability or any indication that the General Assembly contemplated claims against local governments, the LGTCA applies.  <u>See</u> Maj. Slip Op. at 38.

This reasoning reduces the ultimate question of whether the LGTCA applies to a statutory cause of action to the query of whether a statute on its face provides for a damages cap or for a scope of liability different than that provided by the LGTCA.  The Majority essentially concludes that the LGTCA applies by default because SG § 20-1202 does not say otherwise and there is no indication that the General Assembly contemplated causes of action against local governments.

The fact that, according to the Majority, in enacting SG § 20-1202, there is no indication that the General Assembly intended or contemplated claims against local governments is not persuasive.  The plain language and legislative history of the statute demonstrates that in enacting SG § 20-1202, the General Assembly contemplated that the local governments affected by the statute would, if desired in their jurisdictions, enact local ordinances that provide for a cap on damages for any claims.  This is also evident by Howard County's enactment of HCC § 12-217.III with its provisions for a cap on damages, and that the General Assembly would obviously be aware of the ordinance and has not amended SG § 20-1202.

Another aspect of the Majority's opinion that deserves comment is that, despite remanding the case, the Majority does not address Respondent's contention that he is

entitled to back and front pay under the LGTCA and that the LGTCA would apply separately to his claims for discrimination and retaliation, *i.e.*, the claims are two occurrences instead of one. The Majority's silence on the matters should not be interpreted as an adverse decision for Respondent or an indication that the issues should not be addressed on remand.

For the above reasons, respectfully, I concur and dissent.